**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

KAREN O.,                                             Case No. 1:21-cv-738

       Plaintiff,

                                        Bowman, M.J.

   v.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant.

**MEMORANDUM OPINION AND ORDER[1]**

Plaintiff Karen O. filed this Social Security appeal in order to challenge the Defendant's finding that she is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents three claims of error. For the reasons explained below, the ALJ's finding of non-disability is REVERSED because it is not supported by substantial evidence in the record as a whole.

**I. Summary of Administrative Record**

The above-captioned case represents Plaintiff's second appeal in this Court of the Defendant's adverse finding that she is not disabled. The administrative record begins in April 2016, when Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging she became disabled on October 12, 2015 primarily due to fibromyalgia and chronic fatigue syndrome. After her application for benefits was denied initially and upon reconsideration, Plaintiff requested an evidentiary hearing before an Administrative Law Judge ("ALJ"). At a hearing held on July 10, 2018, Plaintiff appeared with former counsel

---

[1]The parties have consented to disposition by the undersigned magistrate judge. See 28 U.S.C. § 636(c).

and gave testimony before ALJ Thuy-Ahn Nguyen; a vocational expert also testified.  (Tr. 42-81). On December 13, 2018, the ALJ issued her first adverse written decision, concluding that Plaintiff was not disabled.  (Tr. 24-37).  Through new counsel, Plaintiff sought further review before the Appeals Council.  The Appeals Council denied review, and Plaintiff filed her first judicial appeal. *See* Case No. 1:19-cv-1093-DRC-KLL

After Plaintiff filed her Statement of Errors in this Court, the parties jointly agreed to remand for further review.  In their joint motion, the parties agreed:

> The Administrative Law Judge will re-evaluate Plaintiff's mental impairments at Step Two. The ALJ will re-weigh the treating source opinions and reconsider Plaintiff's physical and mental RFCs pursuant to both 20 C.F.R. § 404.1527(c) and SSR 96-2p. The ALJ will also re-evaluate the credibility of Plaintiff's subjective complaints of pain and chronic fatigue in accordance with SSR 12-2p and 14-1p. The Commissioner will develop the administrative record as necessary to determine whether Plaintiff is disabled within the meaning of the Social Security Act, hold a new hearing, and then issue a new decision.

(*Id*., Doc 16 Filed: 07/28/20).  The Court granted the motion to remand without the incorporation of any specific instructions. (*Id*., Doc. 17).

Following remand,  the Appeals Council entered a detailed order that elaborated upon numerous deficiencies it found with the ALJ's first opinion. (Tr. 1011-1019).  On January 28, 2021, the same ALJ conducted a new telephonic hearing,[2] (Tr. 940-966).  On April 28, 2021, the ALJ issued a second adverse decision.  The Appeals Council declined further review, leaving the ALJ's second decision intact as the final decision of the Commissioner. (Tr. 910-940).  Plaintiff then filed this second judicial appeal.

Plaintiff was considered a "younger individual," at 46 years old on her alleged disability onset date, but had progressed to the "closely approaching advanced age"

---

[2]Proceedings were conducted telephonically due to the ongoing Covid-19 pandemic.

category on the date of the ALJ's most recent adverse decision.  Plaintiff has a high school education and worked in the Human Resources field for more than 25 years.   Her prior semi-skilled and skilled positions ranged from specific vocational profiles ("SVP") of four (data entry clerk and personnel clerk) up to seven (HR administrator).  (Tr. 931).

The ALJ determined that Plaintiff has severe impairments of fibromyalgia ("FM"), chronic fatigue syndrome ("CFS"), chronic pain syndrome and obstructive sleep apnea, as well as non-severe impairments of obesity, a mood disorder, and an adjustment disorder.  (*See* Tr. 26; Tr. 917).  Plaintiff does not dispute the ALJ's determination that none of her impairments, either alone or in combination, met or medically equaled any Listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff would be entitled to a presumption of disability.  (*See* Tr. 920).  Considering all of Plaintiff's impairments, the ALJ found that Plaintiff retains the residual functional capacity ("RFC") to perform a restricted range of light work, subject to the following limitations:

> [T]he claimant could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She could occasionally balance, stoop, kneel, crouch, and crawl. The claimant should avoid concentrated exposure to extreme cold and wetness. She should avoid even moderate exposure to fumes, odors, dusts, gases, and poor ventilation. Finally, the claimant should avoid all unprotected heights, heavy machinery, and commercial driving.

(Tr. 921; *see also* Tr. 35-36).[3]

Based upon the RFC as determined, the ALJ held that Plaintiff could perform <u>all</u> of her past relevant semi-skilled and skilled HR jobs.  (Tr. 932).  In the alternative, the ALJ found that Plaintiff could perform a substantial number of unskilled jobs in the national economy, including the representative positions of office worker, assembler, and

---

[3]The RFC assessed after the second evidentiary hearing was identical to the prior RFC except for the limitation to avoid "extreme cold and wetness."

packaging clerk. (Tr. 932-933). Therefore, the ALJ again determined that Plaintiff was not under a disability. The Appeals Council declined further review.

In this judicial appeal, Plaintiff asserts closely related errors: (1) the ALJ failed to consider the record as a whole when determining Plaintiff's RFC; (2) the ALJ failed to consider the nature of fibromyalgia ("FM") and chronic fatigue syndrome ("CFS"); and (3) the ALJ improperly evaluated the medical opinion evidence. Plaintiff further argues that the ALJ failed to comply with the detailed instructions of the Appeals Council on remand. For the convenience of the Court, the undersigned discusses the alleged errors in a different order than presented.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports

4

the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted); *see also Biestek v. Com'r of Soc. Sec.*, 139 S. Ct. 1148, 1154 (2019) (explaining that "the threshold for such evidentiary sufficiency is not high.")

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, she suffered an

impairment, or combination of impairments, expected to last at least twelve months, that left her unable to perform any job.  42 U.S.C. § 423(d)(1)(A).

### B.  Plaintiff's Claims

#### 1.  This Court Lacks Jurisdiction to Consider the ALJ's Alleged Failure to Comply with the Appeals Council's Remand Order

Before turning to Plaintiff's specific claims, the Court must address a preliminary issue concerning the jurisdictional scope of this case.  Throughout her 45-page Statement of Errors, Plaintiff argues repeatedly that the ALJ ignored and/or failed to comply with the Appeals Council's remand order.  (*See, e.g.,* Doc. 9 at 4-8, 14-16, 18-21, 29, 36-37, 43-44).  The Commissioner does not respond to these arguments.

Even if the ALJ disregarded the Appeals Council, this Court lacks jurisdiction to review the ALJ's compliance with its order of remand.  "Plainly stated, this Court's scope of review is limited to an analysis of the ALJ's decision and not a review of the ALJ's compliance with the Appeals Council's Order of Remand." *Amber R. v. Com'r of Soc. Sec.*, 2022 WL 3966676, at *2 (S.D. Ohio Aug. 31, 2022) (quoting *Prichard v. Astrue*, No. 2:08-0055, 2011 WL 794997, at *15 (M.D. Tenn. Feb. 28, 2011) (internal quotation omitted)).  The Sixth Circuit has not yet addressed the issue, but the "overwhelming majority of courts in this circuit…have determined that federal courts lack jurisdiction to consider whether an administrative law judge complied with the Appeals Council's instructions on remand." *Shope v. Com'r of Soc. Sec.*, 2015 WL 3823165, at *8 (S.D. Ohio June 19, 2015), adopted at 2015 WL 6155919 (Oct. 20, 2015); *see also Hubbard v. Com'r of Soc. Sec.*, 2019 WL 4593624, at *2 (E.D. Mich. Sept. 23, 2019); *but see Kaddo v. Com'r of Soc. Sec.*, 238 F.Supp.3d 939, 943-44 (E.D. Mich. 2017) (adopting minority view that jurisdiction exists).

6

In addition, several courts have suggested that a later decision not to review an ALJ's decision following a remand order, as occurred in this case, constitutes an implicit finding that the Appeals Council found the second decision to comply with its prior remand order.  *See Amber R.*, 2022 WL 3966676, at *2; *Hubbard*, 2019 WL 4866733, at *3 (same); *Brown v. Com'r of Soc. Sec.*, 2009 WL 465708, at *6 (W.D. Mich. Feb. 24, 2009). Moreover, the actual directives of the Appeals Council did not dictate any particular outcome. *See generally, Foster v. Halter*, 279 F.3d 348, 356 (6th Cir. 2001).

### 2. The ALJ's Erred in the Evaluation of the Medical Opinion Evidence and Failure to Fully Consider the Longitudinal Record

Plaintiff argues that the ALJ erred when she failed to give controlling weight to her treating physician and gave the greatest weight to the opinions of non-examining agency physicians when she assessed Plaintiff's RFC.  Notwithstanding this Court's inability to review the ALJ's compliance with the Appeals Council's Order, the Court agrees that the ALJ committed multiple reversible errors when she evaluated the medical opinion evidence and failed to consider the longitudinal record in the context of FM and CFS.

This case is governed by social security regulations applicable to claims filed before March 27, 2017.  Those regulations provide for the opinions of treating physicians to be given the most weight, and the opinions of examining consultants to be given greater weight than the opinions of non-examining consultants.[4]  20 C.F.R. § 404.1527(c)(1).  The treating physician regulation specifies in relevant part that:

> If we find that a treating source's medical opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's medical

---

[4]Effective March 27, 2017, many long-standing regulations have been revised or rescinded. A new rule entirely replaces the treating physician rule.  *See* 20 C.F.R. § 404.1520c.

opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the medical opinion. We will always give good reasons … for the weight we give your treating source's medical opinion.

20 C.F.R. § 404.1527(c)(2); *see also* Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2 (July 2, 1996).  Only if an ALJ determines that the treating physician's opinions are not entitled to controlling weight should the ALJ consider additional factors to determine how much weight should be afforded to the opinion, such as "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley v. Com'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009); *see also* 20 C.F.R. § 404.1527(c)(2) - (c)(6).

While an ALJ must always provide "good reasons," it is permissible "[i]n appropriate circumstances" to give greater weight to the opinions of state agency medical consultants. *Blakley*, 581 F.3d at 409, quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996).  In *Blakley*, the Sixth Circuit reversed because the non-examining sources on whom the ALJ relied did not have the opportunity to review "much of the over 300 pages of medical treatment ... by Blakley's treating sources," and the ALJ failed to indicate that he had "at least considered [that] fact before giving greater weight" to the consultants' opinions. *Id.*  In this case, the ALJ committed a similar error,

Without elaboration, the ALJ gave the most weight to two agency physicians on grounds that they are "familiar with Social Security Rules and Regulations," and that their opinions are "well supported" with ""no subsequent evidence to warrant a departure" from their conclusions. (Tr. 926-927).  Contrary to that cursory statement, the consulting opinions, rendered in 2016 after review of approximately six months' worth of post-onset

8

records,[5] were not well supported and did not account for nearly 5 years' worth of subsequent records, including a definitive diagnosis of CFS.   And, while Plaintiff's profound fatigue from CFS represents her *primary* symptom, neither agency physician even listed CFS as a "medically determinable impairment." (Tr. 87, 103). Both consultants also discounted Plaintiff's subjective reports of "severe fatigue/pain" based upon an (incorrect) view that "she isn't noted to be tired at doctors['] visits," and "did not seem to have low energy at CE [psychological exam]."  (Tr. 90; Tr. 105).  Notably, *after* the consultants' review, Plaintiff's treating physician submitted 5 separate opinion letters that included the CFS diagnosis and addressed the issue of fatigue.  In fact, many of the subsequent records contain references by treating physicians that reflect Plaintiff's consistent complaints of extreme fatigue,[6] as well as notes that record the treating physician's clinical observations of exhaustion, including yawning.

Considering their failure to consider Plaintiff's CFS and extremely limited access to the longitudinal record, the ALJ's acceptance of the consulting opinions as "well supported" makes little sense.   And the record flatly refutes the ALJ's dismissive statement concerning the absence of relevant evidence after their 2016 opinions were rendered.  As in *Blakley*, the ALJ's analysis gives overly short shrift to the significant body of evidence that post-dated the review by agency physicians and undermined their RFC findings.  *Accord*, *Engel v. Com'r of Soc. Sec.*, 2014 WL 1818187, at *13 (S.D. Ohio May 7, 2014), adopted at 2014 WL 2452995 (June 2, 2014).  In contrast to her cursory

---

[5]Dr. Indira Jasti reviewed a function report dated May 10, 2016, records through April 8, 2016 from Mercy Health, and records through April 26, 2016 from Dr. Pretorius. (Tr. 86).  On reconsideration, Dr. Diane Manos reviewed the same evidence plus minimal additional medical evidence, through August 25, 2016, from Mercy Health.  (Tr. 100).
[6]For example, by early 2016, Plaintiff was complaining of increased fatigue to her treating pain specialist. (Tr. 375).

acceptance of the consulting opinions, the ALJ applied far greater scrutiny to the opinions of Plaintiff's treating physician, which in itself constitutes legal error.  *See Gayheart v. Com'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir.  2013).

Most of the relevant evidence in this case is from Dr. Duell, a family physician who frequently treated Plaintiff over an 8+ year period beginning in October 2012, 3 years prior to her disability onset date.  Dr. Duell diagnosed both FM and CFS.[7] (Tr. 1258).  She provided five opinions between 2016 and 2020, both on questionnaires and in narrative letters, concerning Plaintiff's limitations.  Dr. Duell's opinions contain the following work-preclusive limitations: (1) fatigue-related postural limitations in standing/walking and sitting that limit Plaintiff to 3 hours per day; (2) pain and fatigue-related exertional limitations that preclude <u>sustained</u> activity for more than a few hours per day; and (3) frequent and unpredictable symptoms that are severe enough to require absences from work on a weekly basis.

On November 18, 2016, Dr. Duell first opined upon Plaintiff's postural limitations, stating that Plaintiff can only stand/walk for up to 1 hour and sit for up to 2 hours total in an 8-hour day.  (Tr. 504-508).  In narrative form, she explains in relevant part that Plaintiff's endurance is "generally decreased due to fatigue," that her myalgias and pain are "constant" despite treatment, and that the "frequency [of] her symptoms" would cause her to "miss several days of work weekly."  (Tr. 507, 510).

On February 5, 2018, Dr. Duell opined that Plaintiff was disabled due to multiple limitations from FM and CFS for which medications provided "only modest improvement."

---

[7]Dr. Duell refers to the diagnosis as "CFS/"ME." The full name of the diagnosis is sometimes referred to as "Myalgic Encephalomyelitis/Chronic Fatigue Syndrome." See https://www.cdc.gov/me-cfs (accessed on 10/18/2022).

(Tr. 893).  Dr. Duell adds that Plaintiff has "depression and anxiety" but states that her "inability to work is entirely the result of her …physical symptoms." (*Id.*)  Dr. Duell describes "marked impairment of her daily activities" including difficulty getting "out of bed or off the couch most days." (*Id.*)  Dr. Duell attributes Plaintiff's limitations to extreme fatigue and explains that when Plaintiff engages in any exertion such as running an errand, she needs to "rest by laying down the remainder of the day." (*Id.*)  Dr. Duell opines that restricting activity "is the only way to prevent exacerbation" of her CFS.  She reiterates the postural limitations stated in her November 2016 letter,  (Tr. 896), and concludes that Plaintiff is limited to only "mild intermittent activity," with an "unpredictable" ability to "sustain any activity for even a few hours a day." (Tr. 893).  In support of her diagnoses of FM and CFS, Dr. Duell lists more than 50 rule-out tests that Plaintiff has undergone over a 4-year period. (Tr. 894-895).

In a lengthy letter dated July 2, 2018,[8] Dr. Duell again focused on Plaintiff's CFS and fatigue.  Dr. Duell emphasizes that she has "personally witnessed her physical and emotional struggles that come with the many symptoms associated with both fibromyalgia and CFS/ME." (Tr. 1258).  Dr. Duell states that Plaintiff has "consistently indicated that her fatigue is the most devastating symptom," and that clinical notes document her "appearing exhausted and yawning during the majority of her visits." (*Id.*)  Dr. Duell writes:

> Diagnosis [of CFS] requires that the patient have the following three symptoms: 1. A substantial reduction or impairment in the ability to engage in pre-illness levels of occupational, educational, social, or personal activities, that persists for more than 6 months and is accompanied by fatigue, which is often profound, is of new or definite onset (not lifelong), is not the result of ongoing excessive exertion, and is not substantially alleviated by rest, and 2. Post-exertional malaise,* and 3. Unrefreshing sleep* At least one of the two following manifestations is also required: 1.

---

[8]The July 2018 letter was written after Cigna initially denied Plaintiff private disability benefits. Cigna awarded full benefits on November 2, 2018.

> Cognitive impairment* or 2. Orthostatic intolerance[.] This reference list[s] 5 main symptoms in which 4 out of 5 should be present, Karen exhibits all five symptoms.

(Tr. 1258).

In addition to treatment records, Dr. Duell cites to symptom information from the CDC and to a Functional Capacity Evaluation ("FCE") dated June 2018 to support her RFC opinions that Plaintiff cannot engage in any **sustained** activity.  Dr. Duell also cites to Plaintiff' "orthostatic intolerance."

> This disease is characterized by profound fatigue, cognitive dysfunction, sleep abnormalities, autonomic manifestations, pain, and other symptoms that are made worse by exertion of any sort. ME/CFS can severely impair patients' ability to conduct their normal lives.
>
> As noted above, one of the core symptoms of CFS/ME is post-exertional malaise which is the worsening of symptoms after even minor physical or mental activity. The symptoms typically get worse 12 to 48 hours after the activity and can last for days or even weeks. Please see the enclosed CDC symptoms page which supports this outcome.
>
> I have reviewed the Functional Capacity Evaluation Karen completed … at Oxford Physical Therapy which shows post-exertional malaise was present toward the end of day one and all of day two. This is evidenced by the increase in heart rate noted as well as the examiner's visual exam of Karen. This demonstrates that post-exertional malaise is exacerbating Karen's symptoms.
>
> Karen reports that a typical day is mostly spent laying down on her couch because sitting in an upright position exerts too much energy. This is in response to the orthostatic intolerance symptom that is present with CFS/ME.

(Tr. 1259).

Dr. Duell concludes with an endorsement of the FCE report:

> [A]ccording to the results she demonstrated poor function and system exacerbation post exertion which severely limits her ability to engage in normal activities of daily living. Her metabolic responses, workload, cardiovascular responses, respiratory responses and recovery response were all abnormal. The evidence in the report on heart rate, respiration, oxygen consumption and work in watts supports the conclusion that Karen's

> ventilatory/anaerobic threshold indicates that even low level physical and mental activity will demand more energy than can be aerobically generated.
>
> The report found that Karen's ventilator/anaerobic threshold was such that merely engaging in normal activities of daily living will demand more energy than Karen is able to generate aerobically. Performing such tasks on a consistent basis is a challenge that will likely precipitate the onset/exacerbation of symptoms, including excessive fatigue and pain. This is both a demonstration of physical impairment and a quantifiable limitation of her ability to function in a work environment.

(Tr. 1260-1261) (minor typographical errors corrected). On August 15, 2018, Dr. Duell wrote a fourth, virtually identical RFC opinion letter. (Tr. 1262-1263).

On December 8, 2020, Dr. Duell wrote a fifth letter reiterating that Plaintiff "continues to experience significant daily pain" and "excessive daytime sleepiness and fatigue" on her medications. (Tr. 1264). Dr. Duell again opines that Plaintiff is limited to "only mild intermittent activity," and expresses "doubt that [Plaintiff] would be able to **sustain** any sort of productive activity for an entire day." (*Id.*, emphasis added).

> If somehow she could, she would unquestionably pay for it the next couple of days. As I have also said in prior reports, Karen in my opinion would not be able to maintain any sort of reliable schedule because she never knows one day to the next just how bad things will be in terms of her pain or her fatigue or both. This makes planning virtually impossible for her. At the same time, Karen continues to have cognitive dysfunction (what some people would term "fibro fog") which very definitely affects her ability to comprehend, to retain information, and to focus or concentrate.

(Tr. 1264).

The ALJ rejected all of Dr. Duell's opinions as entitled to "little weight." The ALJ's reasons for rejecting the treating physician's RFC opinions are not "good reasons" and her analysis is not substantially supported."[9] For example, the ALJ first criticizes Dr. Duell's opinions as "extreme." (Tr. 928). But any opinion that includes restrictions to less

---

[9]However, the ALJ properly rejected Dr. Duell's conclusions that Plaintiff is "disabled." Such conclusions are legal determinations, not medical opinions, and are reserved to the Commissioner. (Tr. 927).

than full-time work can be described as "extreme." Such a characterization does not permit an ALJ to disregard an opinion from a treating physician unless it is not "well supported" or is "inconsistent with other substantial evidence."

Here, the ALJ implies that Dr. Duell's opinions are not well supported due to a lack of corroborative "objective" testing and the fact that Plaintiff had "minimal objective abnormalities" upon examination. (Tr. 928; *see also id*., repeatedly noting a lack of muscle wasting or other "objective medical evidence of record" aside from trigger points and tenderness). However, the ALJ's focus on "objective" evidence and lack of "abnormal" musculoskeletal results suggests a fundamental misunderstanding of FM and CFS that runs contrary to the guidance offered in Social Security Rulings 12-2p and 14-1p. The referenced rulings recognize that FM and CFS are conditions for which there are few "objective" tests or "abnormal" physical findings. *See e.g*., SSR 14-1p, 2014 WL 1371245, at *4  ("[S]tandard laboratory test results in the normal range are characteristic for many people with CFS, and they should not be relied upon to the exclusion of all other clinical evidence in decisions regarding the presence and severity of" the condition of CFS). "Unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers v. Com'r of Soc. Sec*., 486 F.3d 234, 243 (6th Cir. 2007). "Rather, fibromyalgia patients 'manifest normal muscle strength and neurological reactions and have a full range of motion.' " *Id*. (quoting *Preston v. Sec'y of Health & Human Servs.,* 854 F.2d 815, 820 (6th Cir. 1988)). In short, unlike more traditional musculoskeletal impairments, the nature of both FM and CFS render an "overemphasis upon objective findings inappropriate." *Rogers,* 486 F.3d at 249.

For instance, the ALJ focused on the lack of "palpably swollen or tender lymph nodes [or] non-exudative pharyngitis" which the ALJ believed to be "typically associated

with" CFS.  (Tr. 928; *see also* Tr. 926).  But the prevalence of those symptoms is not specified by SSR 14-1p.  Instead, both are listed among possible symptoms, meaning their absence was not a basis to discount Dr. Duell's opinions.  Like FM, CFS also can be diagnosed by tender points found on clinical examination. "There is considerable overlap of symptoms between CFS and FM….  People with impairments that fulfill the American College of Rheumatology criteria for FM … may also fulfill the criteria for CFS." SSR 14-1p at n.21, 2014 WL 1371245, at *4.  In addition, "[u]nder the CDC case definition, a physician can make the diagnosis of CFS based on a person's reported symptoms alone after ruling out other possible causes for the person's symptoms." SSR 14-1p; 79 FR 18750-02.  "For a [treating source's] medical opinion to be well-supported by medically acceptable clinical and laboratory diagnostic techniques, it is not necessary that the opinion be *fully* supported by such evidence...." Social Sec. Ruling 96-2p, 1996 WL 374188, *2 (July 2, 1996) (emphasis added).

To be fair, objective evidence is not wholly irrelevant.  SSR 12-2p, for example, still requires  "sufficient <u>objective evidence</u> to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity." 2012 WL 3104869 at *2 (emphasis added). With respect to both FM and CFS, however, the nature of the "objective evidence" or "signs" may vary. *See Swain v. Com'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (noting that, due to the "elusive" and "mysterious" nature of FM, medical evidence confirming the alleged severity of the impairment almost never exists).

With both FM and CFS, a longitudinal record is paramount.  "For a person with FM, we will consider a longitudinal record whenever possible because the symptoms of FM can wax and wane so that a person may have 'bad days and good days.'" SSR 12-2p,

15

2012 WL 3104869, at *6. Similarly, SSR 14-1p explains that an ALJ should look to "[l]ongitudinal clinical records," especially from treating sources, that reflect "functional status over time" such as improvement or worsening of symptoms, along with "physical strength and functional abilities." 2012 WL 3104869 at *2; *see also* 2014 WL 1371245 at *4-5. In the case presented, records spanning more than 8 years from Dr. Duell and from specialists on whom Dr. Duell relied, in combination with her very detailed opinions from 2016-2020, satisfy that requirement.

Despite appropriately finding Plaintiff's FM and CFS to be severe impairments, the ALJ was highly critical of Dr. Duell's failure to personally document the requisite tender points. This was error because Dr. Duell was entitled to rely upon the opinions of multiple specialists to whom she referred Plaintiff, and who found tender points and confirmed the diagnosis of FM between December 2013 and 2017. The subsequent diagnosis of CFS was subsequently confirmed in 2016 and 2017 based on the same tender points, the administration of more than 50 rule-out tests over a four-year period, and Plaintiff's consistent and persistent subjective reports over many years.

The record reflects that Dr. Duell began treating Plaintiff for FM symptoms on January 3, 2013. (Tr. 1258; *see also* Tr. 521-522). Although Dr. Duell's clinical records provide little objective support for the initial diagnosis, the longitudinal record provides ample support. In December of 2013, Dr. Duell referred Plaintiff to a rheumatologist to confirm the diagnosis of "possible fibromyalgia." (Tr. 274). At that exam, Dr. Greenblatt noted multiple tender points consistent with FM in Plaintiff's "buttock and trochanteric region, mild tender points lateral epicondyles, tender points occiput and trapezius areas." (*Id*.) At a second pre-disability-onset referral appointment on November 5, 2014, Plaintiff was examined by Dr. Minhas, a pain management specialist. Dr. Minhas also

16

documented tenderness in Plaintiff's paralumbar region[10] and specifically diagnosed "tender spots of fibromyalgia." (Tr. 352). At a follow-up examination on December 3. 2014, Dr. Minhas again found bilateral tenderness in Plaintiff's paralumbar region and over her extremities. (Tr. 358-359). Dr. Minhas confirmed the FM diagnosis based upon "tender spots of fibromyalgia" and also diagnosed chronic pain syndrome, insomnia, anxiety disorder and fatigue. (Tr. 359-60).

On 10/31/16, Plaintiff was examined by a third specialist, Dr. Danko. (Tr. 721-724). Dr. Danko documented tenderness in trapezius and presence of myofascial trigger points along with bilateral paraspinal muscle tenderness. (*Id.*) Like Drs. Greenblatt and Minhas, Dr. Danko diagnosed Plaintiff with FM, but also assessed <u>chronic fatigue</u>, myofascial muscle pain and arthralgia, unspecified joint. (Tr. 723, emphasis added). Dr. Danko recommended trigger point injections but Plaintiff did not at first proceed due to insurance authorization issues. (Tr. 732). He also advised Plaintiff to continue with the Vicoprofen prescribed by Dr. Duell. (Tr. 721). On a subsequent visit in September 2017, Dr. Danko's staff again documented trapezius and paraspinal tenderness bilaterally. (Tr. 729, 732).

In light of the longitudinal record, the ALJ erred to the extent that she failed to give "controlling weight" to Dr. Duell's RFC opinions based upon her failure to *personally* document Plaintiff's tender points. (Tr. 926, 928). No treating or examining physician ever questioned Dr. Duell's diagnoses. Even if Dr. Duell's initial diagnosis was not fully supported, Dr. Duell's subsequent diagnoses of FM and CFS are not open to the same

---

[10]In another example of "selective" focus that mischaracterized the record, the ALJ stated that Dr. Minhas found "no evidence of tenderness." (Tr. 925, 928, *citing* Tr. 377). The cited record, dated 1/13/16, is from a follow-up appointment after Dr. Minhas and others had established Plaintiff's diagnosis and tender points. Plaintiff sought follow-up treatment due to an increase in her pain and fatigue at that time. Although Dr. Minhas did not record tender points that day, he nevertheless confirmed his prior diagnoses..

criticism. Dr. Duell's diagnoses and course of treatment were confirmed by clinical findings on repeated examinations by three specialists, including a rheumatologist. No legal authority requires a primary care physician to "continuously" document the same tender points once FM and CFS have been conclusively established. *See Delver v. Com'r of Soc. Sec.*, 2008 WL 520624, at *12 (S.D. Ohio Feb. 26, 2008) (noting consistent treatment of FM by primary care physician and that "the consensus of doctors who agree on that diagnosis is more convincing than a map of trigger points.").

The ALJ also was wrong to suggest that Dr. Duell's opinions were not well supported because some of her clinical records failed to document *objective* signs of fatigue despite every record containing subjective complaints of fatigue. As the ALJ concedes, however, Dr. Duell stated that Plaintiff appeared "'exhausted and yawning' during *the majority* of her visits." (Tr. 928, emphasis added). The ALJ's overly selective focus on certain records in which Dr. Duell did not record objective clinical signs of fatigue ignores both the requirement that an ALJ consider the longitudinal record as a whole and the reality that Plaintiff's conditions "wax and wane." SSR 12-2P, 2012 WL 3104869, at *5 (emphasizing that symptoms and signs of fibromyalgia "may vary in severity …and may even be absent on some days."); a*ccord Foster v. Com'r of Soc. Sec.*, 382 F.Supp.3d 709, 715-16 (S.D. Ohio 2019) (reversing because ALJ selectively "focused on the 'normal' (*i.e.,* non-disabling) aspects of Plaintiff's treatment notes to the exclusion of evidence supportive of" the treating physician's opinion); *Hawthorne v. Com'r of Soc. Sec.,* 2014 WL 1668477, at *11 (S.D. Ohio Apr. 25, 2014) (same).

The ALJ further erred in ignoring Plaintiff's frequent and consistent reports over many years of treatment. To the extent that Dr. Duell relied upon Plaintiff's subjective reports of unrelenting pain and profound fatigue in formulating her opinions, she was

18

entitled to do so. "Given the nature of fibromyalgia and the absence of objective evidence to confirm its severity, a physician must necessarily rely on his or her patient's self-reported pain and other symptoms as an 'essential diagnostic tool' in determining the plaintiff's limitations." *Engel*, 2014 WL 1818187, at *12 ; *see also Foster* (same). In short, Dr. Duell's treatment over many years, along with the consistency of her opinions and treatment records, entitle that physician's opinions to controlling weight. *See Hill v. Berryhill*, 2017 WL 1593476, at *6 (S.D. Ohio May 2, 2017), adopted at 2017 WL 3332238 (S.D. Ohio Aug. 4, 2017) (holding that ALJ erred by failing to discuss a lengthy period of, and frequency of treatment, consistency of treating physician's opinions over time, and lengthy and well-reasoned explanation for the signs, symptoms, and limitations caused by chronic fatigue syndrome); a*ccord*, *Engel*, 2014 WL 1818187, at *11 (ALJ's reliance on the lack of "objective" evidence to discount her treating physician's opinions was inconsistent with plaintiff's diagnosis of fibromyalgia).

The ALJ mischaracterized the record when she stated Plaintiff was "stable on medication with no side effects." (Tr. 925-926, 928, citing 2018 and 2019 records). Likewise, the ALJ questioned Dr. Duell's failure to continuously change Plaintiff's treatment. (Tr. 924, 926). Although earlier records reflect multiple referrals to specialists and medication changes; there is nothing in the record to suggest that some other treatment would be more effective than the particular combination of narcotic pain medications, muscle relaxers, and stimulants that Dr. Duell landed upon. SSR 16-3p explains that when considering treatment history, an ALJ should consider that an individual has not altered "periodic treatment or evaluation for refills of medications because …her symptoms have reached a plateau." *Id*., 2017 WL 5180304, at *9. Dr. Duell clearly opined that despite medications, Plaintiff's condition has plateaued at a level

of severe limitations. The ALJ's suggestion that "stable" meant "resolved" or that Plaintiff's fatigue was "control[led]" is wholly unsupported.[11]

Based on the record presented, Dr. Duell's well-supported opinions were entitled to controlling weight. A June 2018[12] Functional Capacity Exam that was ordered by and specifically endorsed by Dr. Duell only adds to that conclusion.. The FCE was administered by Roche Croy, the Director of Industrial Rehabilitation at Oxford Physical Therapy. However, the ALJ rejected the opinions on grounds that Mr. Croy was not a physician and therefore "not an acceptable source." The ALJ also stated that his opinions were "not *entirely* consistent with the record." (Tr. 928-929, emphasis added).[13] In *Hargett v. Com'r of Social Security*, 964 F.3d 546 (6th Cir. 2020), the Sixth Circuit held that when an FCE ordered by a physician but prepared by a physical therapist is later reviewed and co-signed by a treating physician, that FCE must be considered as an opinion of the treating physician even when the source who prepared the FCE is not part of the same treatment team. *See id*. at 553 (noting that treating physician referred plaintiff for FCE and signed off on the results and therefore "the ALJ should have considered the FCE as a treating-source opinion."). As in *Hargett*, Dr. Duell was the referring physician. (Tr. 898). While Dr. Duell did not co-sign the FCE report, Dr. Duell explicitly endorsed and relied upon its findings.

_____

[11]The ALJ stated that Plaintiff's fatigue was controlled by Ritalin. (Tr. 928; *see also* Tr. 924). The ALJ cited to a single record, dated 4/14/15 *prior to Plaintiff's disability onset date*, that was authored by an endocrinologist from whom Plaintiff sought *additional treatment for fatigue*. At that visit, Plaintiff reported that Ritalin only "helps a little with energy." (Tr. 313). Neither at that visit nor on any other post-onset date did Plaintiff ever suggest that her fatigue was "controlled."
[12]The FCE form contains a typographical error concerning the date. The Court understands that the two consecutive days of the exam occurred in June of 2018.
[13]The ALJ does not define the nature of any inconsistency. The undersigned can only infer that the ALJ's statement refers to objective findings that do not relate to FM and CFS, and/or to the RFC reports of the consulting physicians, which are not substantially supported for the reasons previously discussed.

Even if not considered as Dr. Duell's opinions under *Hargett*, the ALJ's cursory rejection of the FCE report ignores its level of detail. The FCE assessed the reliability of Plaintiff's reports. Testing demonstrated "a considerable deterioration in functional tolerances and endurance during the second half of day one and all but the first 30 minutes of her second day of testing." (Tr. 899). Whereas Plaintiff reported low (1-2/10) pain levels prior to testing on the first day, pain symptoms increased to a 6/10 at the conclusion of the first day, reduced overnight to a 4/10 at the beginning of day two, and again quickly elevated to 6/10 on day two. Clinically, "[a] significant deterioration in strength and functional endurance was witnessed after about two hours of testing day one," which deterioration "continued through the second half of day one testing and all of day two testing." (*Id.*) Plaintiff also demonstrated reduced tolerances with successive lifting or handling tasks. And "within a couple hours of either physical activity or sustained postures including sitting and standing, fatigue and pain begins to set in," with her "ability to resume sustained postures and physical activity" increasingly impaired. (*Id.*) Testing showed elevated heart rates "consistent with reports of pain and/or maximum effort as evidenced by more than a 25% increase in heart rate during the PILE shoulder lift." (Tr. 901). She also demonstrated "competitive behaviors throughout testing," and the "Hoover Test" was negative for self-limiting behavior. Last, the FCE compared Plaintiff's subjective reports of pain and dysfunction with actual observed behaviors through a combination of questionnaires. (Tr. 902). The report concluded that Plaintiff's "endurance deteriorates rapidly with sustained physical activity." (Tr. 902). Based upon both postural and exertional fatigue tolerances, the FCE concluded Plaintiff was limited to no more than two to four hours of daily exertion or activity over two consecutive days. Although the ALJ was justified in rejecting the report's ultimate "disability" conclusion, the ALJ's dismissal

of specific exertion and postural limitations concerning *sustained* activities was overly conclusory.

### 3. The ALJ Erred in Evaluating Plaintiff's Subjective Complaints

The ALJ also erred in her evaluation of Plaintiff's subjective complaints. In general, it is the province of the ALJ and not the reviewing court to assess subjective complaints about the impact of a claimant's symptoms with the record as a whole. *See Rogers v. Com'r*, 486 F.3d at 247. The assessment of such symptoms, formerly referred to as the "credibility" determination, was clarified in SSR 16-3p to remove the word "credibility" and refocus the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as <u>consistent</u> with the objective medical and other evidence in the individual's record." SSR 16-3p, 2017 WL 5180304 at *2 (October 25, 2017) (emphasis added). However, SSR 16-3p did not substantially change existing law. *See Banks v. Com'r of Soc. Sec.*, Case No. 2:18-cv-38, 2018 WL 6060449 at *5 (S.D. Ohio Nov. 20, 2018) (quoting language in SSR 16-3p that states intention to "clarify" and not to substantially "change" existing SSR 96-7p), adopted at 2019 WL 187914 (S.D. Ohio Jan. 14, 2019). Thus, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).[14] A credibility/consistency determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). This represents

---

[14]*But see Patrick S. v. Kijakazi*, 2022 WL 6257804, at *6 (S.D. Ind. April 26, 2022) (finding it noteworthy that in a telephonic hearing held during the COVID-19 pandemic, an ALJ could not see the claimant or observe his demeanor).

the relatively rare case in which the ALJ's evaluation of Plaintiff's subjective symptoms is not substantially supported.

Plaintiff alleges she cannot work due to chronic pain and profound fatigue, and maintains that her postural and exertional fatigue require her to lie down most of the day.[15] She also alleges cognitive impairment. To evaluate her subjective complaints, the ALJ was required to first determine whether a medically determinable impairment exists that could reasonably be expected to produce the alleged symptoms. The ALJ appropriately found that severe FM and CFS could produce Plaintiff's symptoms. However, the ALJ committed reversible error at the second step – the assessment of "the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities," *see* SSR 16-3p, 2017 WL 5180304, at *3; see also SSR 12-2p (providing guidance for the evaluation of FM) and SSR 14-1p (providing guidance for the evaluation of CFS).

Plaintiff's primary complaint of fatigue – like Plaintiff's alleged muscle pain – is nearly impossible to measure through objective testing. Yet the ALJ rejected Plaintiff's overwhelmingly consistent subjective complaints based solely upon the lack of "objective" findings. "[I]n October of 2015, the claimant stopped working…. However, the **objective medical evidence of record does not a reflect a worsening physical condition** when compared to her symptoms while still employed." (Tr. 924, emphasis added; *see also* Tr. 924, "Her tender points notwithstanding, the claimant ambulated normally, she maintained normal muscle strength throughout, and there was no evidence of overt muscle wasting."). The ALJ's entire analysis focused on the frequency of "normal,"

---

[15]Dr. Duell states that Plaintiff suffers from orthostatic intolerance, which SSR 14-1p lists as a symptom of CFS.

23

"unremarkable" and/or "nominal" objective findings such as the absence of muscle spasm or muscle wasting, good range of motion, and normal gait and muscle strength. (Tr. 924-925).

But objective evidence can never the <u>sole</u> determinative factor for discounting a plaintiff's subjective symptoms. "We will not evaluate an individual's symptoms based *solely* on objective medical evidence unless that objective medical evidence supports a [disability] finding." SSR 16-3p, 2017 WL 5180304, at *5 (emphasis added). Thus, an ALJ must consider "the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms." SSR 12-1p, 2012 WL 314869 at *5; SSR 14-1p, 2014 WL 1371245 at *7; *see also* SSR 16-3p. The ALJ committed reversible error by singularly focusing on the lack of "objective" evidence available to prove fatigue as outcome-determinative.[16]

Contrary to the ALJ's focus "objective" findings, all other relevant factors support Plaintiff's subjective complaints. For example, the record strongly supports Plaintiff's report that worsening symptoms led up to her leaving her longstanding employment. Having worked continuously in the HR field for the same employer for more than 20 years, Plaintiff continued to work for two years after her diagnosis. During that time, she sought

---

[16]The ALJ's refence to the lack of "muscle wasting" is only minimally supported by language in SSR 16-3p that states that a claimant who alleges being limited by m*uscle weakness* to "standing and walking … no more than a few minutes a day would be expected to have some signs of muscle wasting." Here, Plaintiff complains of exertional fatigue rather than constant muscle weakness. SSR 16-3p explains that muscle weakness without muscle wasting may be consistent based "on the other evidence in the record." *Id.*, 2017 WL 5180304, at *5. The FCE report confirmed and quantified Plaintiff's severe *post-exertional* fatigue,

work accommodations for increasingly severe symptoms,[17] including a 12-week leave of absence under the Family Medical Leave Act, (Tr. 956-57), and transfer to a less stressful position as a "way to hold onto my job." (Tr. 50).  Plaintiff also requested a 4-day work schedule to allow a mid-week day of rest.  (Tr. 58).[18]  Even with that schedule, she testified to worsening symptoms including cognitive impairment and fatigue that caused her to fall asleep at her desk. (Tr. 57). She fell asleep behind the wheel in September 2015.  (Tr. 57, 60).  Her symptoms led to anxiety and she began noticing "cognition issues" where she could not recall HR "policies that I used to know."  (Tr. 57).   Concluding that her profound fatigue was a danger and that she could no longer sustain a consistent schedule, she left work permanently in October 2015.

The longitudinal record demonstrates that, consistent with her testimony, Plaintiff reported her increasingly severe symptoms to her treating physicians. The nature and frequency of treatment provided by Dr. Duell over time is consistent with her complaints. For example, close in time her disability onset, Plaintiff sought additional treatment from Dr. Duell every few weeks. At those visits, Dr. Duell noted objective clinical observations that closely align with Plaintiff's subjective reports.  (*See*, *e.g.*, Tr. 401, 11/5/15 note that Plaintiff appears "very fatigued," "[y]awining frequently"; Tr. 400,  12/3/15 note that Plaintiff is "yawning constantly" and having "[d]ifficult[y] keeping her eyes open" during exam). Both prior to and after her disability onset date, she complied with prescribed treatment and followed up on multiple referrals.

---

[17]Although the ALJ was not required to explicitly discuss every factor, Plaintiff's exemplary work history supports her subjective reports.  *See France v. Com'r of Soc. Sec.*, 2022 WL 465680, at *23 (N.D. Ohio Jan. 24, 2022) ("[W]ork history is an appropriate factor to consider in assessing her subjective complaints under SSR 16-3p."); *see also* 20 C.F.R. § 404.1529(c)(3) (version applicable to claims filed prior to 3/27/17, stating that SSA "will consider… information about your prior work record.").

[18]Despite her reduced schedule, Plaintiff's earnings remained at the substantial gainful activity level.

By reference to a single note, the ALJ mischaracterized the entire longitudinal clinical record as "inconsistent" with Plaintiff's complaint of worsening fatigue and a need to lie down. (Tr. 924, stating that "the claimant indicated that her symptoms were aggravated by laying down, which contradicts her testimony." ).  In the cited 10/12/15 record, Plaintiff presented with a *new* complaint of cough that Dr. Duell diagnosed as bronchitis and congestion. (Tr. 402).  While the cited record does report that Plaintiff's symptoms were aggravated by lying down, the only reasonable contextual interpretation is that her *acute cough symptoms* increased with lying down, not her chronic FM and CFM symptoms.  Contrary to that single record taken out of context, the rest of the clinical record overwhelmingly supports her complaints that profound fatigue and chronic pain limit her ability to maintain and sustain a regular work schedule.[19]

Other factors are also consistent with Plaintiff's subjective complaints that her chronic pain and profound fatigue preclude sustained activities of any kind. Beginning with her 2016 function report, to her testimony at both hearings, to the referenced clinical records, Plaintiff consistently reported that even short exertional activities exhaust her. Of note, the ALJ did not point to and this Court has not found any internal inconsistencies throughout the record among Plaintiff's multiple subjective accounts of her limited daily activities. (*See* Tr. 922-23, ALJ's summary of daily activities).

SSR 14-1p explains that in the evaluation of CFS as well as under SSR 16-3p, "we... may consider evidence from medical sources we do not consider 'acceptable

---

[19]*See. e.g.* Tr. 643-444, 7/15/16 report to Dr. Duell that "all she does is sit all day due to extreme fatigue" and note that she is "yawning and appears very sleepy" during exam; Tr. 721, 10/31/16 report to Dr. Danko that pain improves with "rest lying down changing positions" and worsens with "sitting standing walking running kneeling"; Tr. 654, 11/18/16 report to Dr. Duell that despite medications, "continues to be very difficult for her to do much" and "cannot stand much…due to fatigue"; Tr. 726. 7/17/17 report that pain improves with rest and lying down, worsens with sitting standing walking etc.; Tr. 886, 9/7/17 report to pain clinic that she "[h]urts everywhere. Hard to get out of bed."

medical sources' as well as "nonmedical sources" including third party statements from relatives, neighbors and friends. *Id.* Here, the ALJ discounted the FCE report as from someone who was not an "acceptable" medical source without additional consideration of SSR 14-1p.[20]  Plaintiff also submitted four third-party statements from nonmedical sources that also strongly supported her subjective complaints. Rather than acknowledging the overwhelming consistency of those statements under SSR 14-1p, the ALJ summarily dismissed them as "lack[ing] substantial support from the objective findings" including "objective…testing." (Tr. 929; *see also* Tr. 923).  The ALJ's relentless focus on the lack of "objective findings" to prove the severity of Plaintiff's fatigue and pain – to the exclusion of virtually all other evidence in the record – was error.

### 4.  The ALJ's Assessment of Plaintiff's Mental Impairments

The last error the Court will briefly address concerns the ALJ's assessment of Plaintiff's mental impairments.  The examining agency psychologist, two non-examining agency consultants and Dr. Duell all offered opinions that Plaintiff suffers from "severe" mental impairments of anxiety and depression that cause her to have "mild" to "moderate" mental limitations in multiple areas.  Disregarding all opinions, the ALJ found Plaintiff's anxiety and depression to be non-severe and assessed no mental or cognitive functional limitations.  Plaintiff argues that if the limitations assessed by agency reviewers been adopted, she would have been restricted to (at most) a lower level of  unskilled work.

Despite some concern with the ALJ's analysis as it pertains to possible cognitive impairment,[21] the alleged error presents a closer issue than do the errors concerning her

---

[20]As discussed, the FCE was expressly adopted by Dr. Duell.

[21]Although Plaintiff has not argued this specific point, the Court notes one anomaly given the ALJ's selective focus on the lack of objective data to prove Plaintiff's complaints of fatigue: the ALJ failed to discuss

physical limitations. After all, a failure to find a "severe" impairment at Step 2 will not usually require reversal where an ALJ has determined the existence of other severe impairments and progressed through the sequential analysis. *See Maziarz v. Secretary of Health and Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987); 20 C.F.R. § 404.1520.

Here, Plaintiff concedes that her claim is not dependent upon her mental impairment, because she alleges disability primarily due to physical symptoms from FM and CFS. In addition, Plaintiff has undergone no significant mental health treatment. While Dr. Duell initially prescribed medications to treat her anxiety and depression, Plaintiff discontinued those medications. Ultimately, the Court finds no need to decide whether an alleged error in the assessment of Plaintiff's mental or cognitive impairments would require remand, because the record overwhelmingly supports remand based on errors in the ALJ's assessment of Plaintiff's physical impairments.

### C. An Immediate Award of Benefits is Warranted

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted "only where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking." *Felisky*, 35

---

objective testing concerning Plaintiff's alleged cognitive impairment. The ALJ discredited Plaintiff's complaint of "fibro fog," a symptom endorsed by Dr. Duell in both 2016 and 2020 opinions, on grounds that her mental status exams did "not note any cognitive issues." (Tr. 928). But an endocrinologist assessed mild cognitive impairment on testing. (*See* Tr. 283, noting impairment "bordering on early dementia," and a SPECT brain scan that was "abnormal consistent with nonspecific cerebral inflammation that could be the source of chronic fatigue"; *see also* Tr. 296, noting cortical deficits and other imaging evidence consistent with amnestic mild cognitive impairment).

F.3d at 1041 (quoting *Faucher v. Sec'y of Health & Humans Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)).

Here, the evidence establishes that remand for an award of benefits is warranted. The record contains overwhelming evidence of disability, and/or strong evidence with an absence of contrary "substantial evidence" that could support a non-disability finding on remand.  Dr. Duell's well-explained and well-supported opinions about the disabling impact of Plaintiff's FM and CFS in particular strongly support her inability to engage in either her past relevant work or any other sustained unskilled work activity at the SGA level. *Accord Hill v. Berryhill*, 2017 WL 1593476, at *7-8.

### III. Conclusion and Order

For the reasons explained herein, **IT IS ORDERED THAT** the decision of the Commissioner to deny Plaintiff DIB benefits be **REVERSED and REMANDED for an immediate award of benefits**.

 *s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge